

**FEDERAL SERVICES**

Home   About ˅   Products ˅   Training ˅   Real Cases Solved   Resources ˅   Science ˅   AIS Course ˅   Blog   Contact Us   Visit Us

## CVSA III NOW AVAILABLE

**ANNOUNCEMENT** - Due to the worldwide Coronavirus crisis, we have been advised Dell Rugged 14 notebooks are not available until further notice. The CVSA III will continue to be available, housed in the business-grade Dell Latitude 5400. For further information please **contact us**.

**The CVSA is sold only to law enforcement/government agencies... The CVSA is now used by over 2,500 US la**

79.   The Dektor website further states: "In late 2006, NITV began to advertise in insurance magazines with full page ads. It appears they were trying to make up for the drastic drop in CVSA sales to law enforcement. NITV tried to get insurance companies to buy CVSA and use it as a over-the-phone lie detector for insurance fraud. If they did so, millions of real claims would be denied because of the poor accuracy caused by unreliable CVSA technology and unreliable NITV training. Dektor contacted the magazine and educated them about NITV. Soon, NITV was banned from advertising in those insurance magazines." (available at http://www.dektorpse.com/information/cvsa/).

80.   This statement is false.   Plaintiff did not experience any drop in sales to law enforcement and was never banned from advertising in insurance magazines.

**EXHIBIT**  *4*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 9:18-cv-80994-Middlebrooks/Brannon

NITV FEDERAL SERVICES, LLC,

 Plaintiff,

v.

DEKTOR CORPORATION and ARTHUR
HERRING, III,

 Defendants.

---

### DECLARATION OF MIGUEL MOSQUERA

Miguel Mosquera does hereby declare pursuant to 28 U.S.C. § 1746:

1.   This declaration is based on my personal knowledge.



2.   I am not a member, owner, director, officer, manager, or employee of Plaintiff.

3.   I am a resident and citizen of the State of Florida.



4.   I have been informed that this lawsuit was filed on July 27, 2018.  Prior to that date, I accessed Dektor's website (www.dektorpse.com) from a computer within the State of Florida and viewed the material thereon concerning Plaintiff and its CVSA product.

5. '   I am also aware of other individuals within the State of Florida (who are likewise not members, owners, directors, officers, managers, or employees of Plaintiff) who accessed Dektor's website and viewed the same material concerning Plaintiff and its CVSA product prior to the filing of this lawsuit.



I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Case 9:18-cv-80994-DMM    Document 50-2    Entered on FLSD Docket 11/16/2018    Page 2 of 2

Dated: November 16, 2018

Miguel Mosquera

*Exhibit   4*

**FEDERAL SERVICES**

**Miguel Mosquera**

International Sales - Advanced CVSA II Examiner

Cell: 1.407.970.3349

E-mail: mian243@aol.com

11400 Fortune Circle | West Palm Beach, FL 33414

*www.cvsa1.com*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 9:18-cv-80994-Brannon

NITV FEDERAL SERVICES, LLC,

      Plaintiff,

v.

DEKTOR CORPORATION and ARTHUR
HERRING, III,

      Defendants.

## DECLARATION OF KEVIN R. FOYTECK

      Kevin R. Foyteck does hereby declare pursuant to 28 U.S.C. § 1746:

1.     This declaration is based on my personal knowledge.

2.     I am a certified public accountant in practice since January 2016 with Ellrich, Neal, Smith & Stohlman, P.A. ("ENSS"). My curriculum vitae is attached hereto as Exhibit "A."

3.     ENSS was retained by plaintiff NITV Federal Services, LLC ("Plaintiff") to perform specific engagements as directed by management and/or his counsel, which included analyzing historical revenue growth and new customers.

4.     ENSS was provided with Plaintiff's accounting/QuickBooks data files to evaluate Plaintiff's sales, customers, revenue, and gross profit margins dating back to 2005 (information prior to this date was not readily available). ENSS's work product and conclusions are attached hereto as Exhibit "B" (Exhibits 1-4).

5.     ENSS evaluated Plaintiff's damages (from 2014 – 2018) utilizing agreed upon procedures at the direction of management and/or his counsel to identify, analyze, and quantify potential damages based on an analysis of new customers and historical revenue trends over the relevant

time period that records were made available.  In reviewing the Plaintiff's new customer additions post-recession, the Plaintiff's new customer additions relatively recovered to pre-recession levels in 2010 and 2011. However, new customer additions drop off precipitously from 2012 forward. To assess lost revenue from this new customer decline, ENSS utilized the average number of new customers that Plaintiff realized in 2010 – 2011 of 361.5 as a baseline as the expected annual new customers. ENSS then compared this average figure to the actual number of new customers realized by Plaintiff in 2014, 2015, 2016, 2017, and 2018. This resulted in a 'loss' of 1,418 new customers during this 5-year period.

6.    Based on Plaintiff's SALES BY CUSTOMER SUMMARY, an average annual revenue per customer of $3,280, which was calculated by taking the average annual revenue per customer from 2006 to 2018, was applied to the lost new customers to calculate lost revenue of $4,649,602.

7.    ENSS then reviewed the Declaration of Charles W. Humble (Plaintiff's founder) and his analysis of market conditions other than Defendants' conduct that could have resulted in lost new customers and revenue. Per management's estimate, ENSS applied a 11% downward adjustment in the lost revenue to adjust for market factors, which resulted in lost revenue of $4,138,146.

8.    Because lost profits must be based on profit rather than revenue losses, ENSS evaluated Plaintiff's HISTORICAL FINANCIAL STATEMENTS to determine the dollar weighted average gross profit margin from 2005 to 2018 of 69.9% (see Exhibit 3).  Applying that gross profit margin to the adjusted lost customer revenue, arrived at total damages of $2,890,631.

9.    ENSS performed the same analysis for the same number of lost customers, but for this task, used the average revenue per customer from 2010 – 2018 (as revenue per customer for 2006 – 2008 was substantially higher than the revenue per customer in later years and could potentially skew the average).  This resulted in average revenue per customer of $2,751 (rather than $3,280)

2

and, after accounting for management's estimated 11% adjustment (discount for market factors) and the gross profit margins, damages amounted to $2,424,201.

10.      Finally, Exhibit 2 utilizes the Plaintiff's pre-recession revenue as a barometer as to what the company would be expected to achieve after the recession. This analysis compares the Plaintiff's pre-recession revenue (using calendar year 2006 as the baseline) to Plaintiff's revenue from 2014 – 2018, with the difference representing lost revenue. After analyzing the lost revenue and applying both the market factor discount and gross margin percentage, the damages from this analysis amounted to $2,355,643.

11.      In comparing these three damages amounts, ENSS selects the second scenario in Exhibit 1, which has the lower average revenue per customer as calculated from 2010-2018, as the fairest measure of the Plaintiff's damages based upon ENSS's agreed upon procedures. The other scenarios however, may be used as corroborative checks to the selected analysis.

12.      ENSS was not tasked with evaluating future lost profits (from 2019 and beyond). Therefore, this analysis is solely limited to past damages.

13.      ENSS did not perform any analysis of potential damages as it relates to Plaintiff's claims of lack of sales in the Texas market.

.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 5, 2019

Kevin R. Foyteck, CPA, CVA

3

EXHIBIT 4
SUMMARY OF REVENUE BY CUSTOMER
NTIV FEDERAL SERVICES, LLC & NTIV, LLC

| Customer [1] | Company | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Customer #1 | NTIV | $ | $ | 3,218 | $ | $ | $ | | | | | | | |
| Customer #2 | Fed Serv | | | | | | 18,100 | | | | | | | |
| Customer #3 | Fed Serv | | | | | 295 | | | | | | | | |
| Customer #4 | Fed Serv | | | | | | | 4,185 | 295 | 545 | 1,645 | 745 | 805 | 1,690 |
| Customer #5 | NTIV | 1,400 | | | 255 | 590 | | | | | | | | |
| Customer #6 | NTIV | | | 6,900 | | | | | | | | | | |
| Customer #7 | NTIV | | 2,095 | | | | | | | | | | | |
| Customer #8 | Fed Serv | | | | | | | | | | 8,495 | | | |
| Customer #9 | Fed Serv | | | | | | | | 700 | | | | | |
| Customer #10 | Fed Serv | | | | | | | | 580 | | 700 | | 1,050 | 1,295 |
| Customer #11 | Fed Serv | | | | | | | | | | | 5,995 | | |
| Customer #12 | Fed Serv | | | | | 9,195 | 2,590 | 8,185 | | | | 790 | 9,255 | |
| Customer #13 | Fed Serv | | | | | | 150 | | | | | | | |
| Customer #14 | Fed Serv | | | | | | | 750 | 16,330 | | | | 3,045 | 2,726 |
| Customer #15 | Fed Serv | | | | | | | | | 9,076 | 16,025 | 745 | 3,775 | |
| Customer #16 | NTIV | | 17,725 | | 590 | 1,295 | | | | | | | | |
| Customer #17 | NTIV | | | | | 4,185 | | | | | | | | |
| Customer #18 | Fed Serv | | | | | | 8,531 | 36,780 | 420 | | | | | |
| Customer #19 | Fed Serv | | | | | | 590 | 4,285 | | | 395 | | 1,295 | |
| Customer #20 | NTIV | 1,185 | | | 590 | | | | | | | | | |
| Customer #21 | Fed Serv | | | | | | | | | | 7,490 | | | |
| Customer #22 | Fed Serv | | | | | | | 395 | | | | | | |
| Customer #23 | Fed Serv | | | | | | | | | | | | 8,995 | |
| Customer #24 | Fed Serv | | | | | | 3,985 | | 350 | | | 350 | 4,620 | 3,125 |
| Customer #25 | NTIV | 1,440 | | 2,280 | | | | | | | | | | |
| Customer #26 | NTIV | 1,440 | | | | | | | | | | | | |
| Customer #27 | NTIV | 1,835 | | 1,295 | 590 | | | | | | | | | |
| Customer #28 | NTIV | 69 | 1,440 | | | | | | | | | | | |
| Customer #29 | Fed Serv | | | | | 2,895 | | 590 | 1,295 | 1,295 | | 395 | 2,985 | |
| Customer #30 | Fed Serv | | | | | | 295 | | | | | | | |
| Customer #31 | Fed Serv | | | | | | | 2,590 | 250 | 640 | | 2,085 | | 1,645 |
| Customer #32 | NTIV | | | | 5,785 | | | | | | | | | |
| Customer #33 | NTIV | | 2,995 | | | | | | | | | | | |
| Customer #34 | NTIV | | | 2,590 | 1,295 | | | | | | | | | |
| Customer #35 | Fed Serv | | | | | | | | 3,795 | | | | | |
| Customer #36 | Fed Serv | | | | | | | | 295 | | 2,590 | | | |
| Customer #37 | NTIV | | | 1,295 | | | | | | | | | | |
| Customer #38 | NTIV | | 3,295 | | | | | | | | | | | |
| Customer #39 | NTIV | | | | 9,195 | | | | | | | | | |
| Customer #40 | Fed Serv | | | | | | 9,195 | 295 | | 2,590 | 350 | 790 | | 3,380 |
| Customer #41 | NTIV | | | | | 10,194 | | | | | | | | |
| Customer #42 | Fed Serv | | | | | | 3,490 | | 1,645 | 350 | 745 | 2,500 | 1,334 | 20,090 |
| Customer #43 | NTIV | | 4,635 | | | | | | | | | | | |
| Customer #44 | NTIV | | 690 | | 2,590 | | | | | | | | | |
| Customer #45 | Fed Serv | | | | | | | | | | | | 9,083 | |
| Customer #46 | NTIV | | | | | 9,195 | | | | | | | | |
| Customer #47 | Fed Serv | | | | | 120 | 590 | 590 | | 1,050 | 4,630 | | | |
| Customer #48 | NTIV | | 590 | 590 | 3,685 | | | | | | | | | |
| Customer #49 | Fed Serv | | | | | | 1,295 | | 1,068 | 450 | 395 | | 1,185 | 60 |
| Customer #50 | NTIV | | 1,440 | 3,195 | 295 | | | | | | | | | |
| Customer #51 | Fed Serv | | | | | | 2,550 | 885 | 495 | 1,050 | 2,500 | 9,085 | 1,295 | |
| Customer #52 | NTIV | 13,175 | 2,880 | | 1,590 | 295 | | | | | | | | |
| Customer #53 | Fed Serv | | | | | 590 | | | 885 | | 1,295 | 1,185 | 3,030 | |
| Customer #54 | NTIV | 1,444 | | 285 | 3,195 | | | | | | | | | |
| Customer #55 | Fed Serv | | | | | | | | | | 11,985 | | | 940 |
| Customer #56 | Fed Serv | | | | | 295 | 1,590 | | | 8,290 | | 790 | 3,775 | |
| Customer #57 | Fed Serv | | | | | 1,402 | | 8,815 | | 10,500 | | 2,480 | | |
| Customer #58 | Fed Serv | | | | | 15,800 | | 17,570 | | 1,280 | | 1,185 | | 790 |
| Customer #59 | Fed Serv | | | | | | | | | | | | | 6,335 |
| Customer #60 | Fed Serv | | | | | | | 9,995 | | | | | | |
| Customer #61 | Fed Serv | | | | | 195 | 2,590 | | | | | | | |
| Customer #62 | NTIV | | 10,285 | | | | | | | | | | | |
| Customer #63 | NTIV | | 2,880 | | | | | | | | | | | |
| Customer #64 | NTIV | | | | 25 | | | | | | | | | |
| Customer #65 | Fed Serv | | | | | | 495 | | | | | | | |
| Customer #66 | NTIV | | 1,085 | 295 | | | | | | | | | | |
| Customer #67 | NTIV | 690 | 14,060 | 8,055 | 6,180 | | | | | | | | | |
| Customer #68 | Fed Serv | | | | | 648 | | 3,180 | | 4,985 | | 395 | | |
| Customer #69 | NTIV | 395 | 4,435 | 590 | | 295 | | | | | 8,495 | 495 | 1,295 | 1,690 |
| Customer #70 | Fed Serv | | | | | | 2,895 | 500 | 250 | | | 1,995 | 350 | 2,740 |
| Customer #71 | Fed Serv | | | | | | | | | | | | | |
| Customer #72 | NTIV | 1,440 | 395 | 1,295 | | 1,295 | | | | | | | | |
| Customer #73 | NTIV | | 395 | | | | | | | | | | | |
| Customer #74 | NTIV | | | | | | | | | | | | | |
| Customer #75 | Fed Serv | | | | | | | | 3,985 | | | 350 | 395 | |
| Customer #76 | Fed Serv | | | | | | | | | 990 | | | | |
| Customer #77 | NTIV | | | 295 | | | | | | | | | | |
| Customer #78 | Fed Serv | | | | | | 3,590 | | | | | | | |
| Customer #79 | Fed Serv | | | | | | 7,895 | | | | 350 | 1,295 | | |
| Customer #80 | Fed Serv | | | | | | | | | | | 10,685 | 1,295 | 1,710 |
| Customer #81 | Fed Serv | | | | | 295 | 17,570 | 6,475 | 2,235 | 1,750 | 22,875 | | 1,580 | 1,295 |
| Customer #82 | Fed Serv | | | | | | 8,155 | 295 | | 580 | | 1,995 | | |
| Customer #83 | NTIV | | 25,700 | 1,475 | 12,780 | | | | | | | | | |
| Customer #84 | Fed Serv | | | | | | | | | | | | | 3,200 |
| Customer #85 | Fed Serv | | | | | | | | | | | | | 60 |
| Customer #86 | NTIV | | 1,995 | | | | | | | | | | | |
| Customer #87 | NTIV | | | | | | 295 | | | 1,645 | | | 395 | |
| Customer #88 | NTIV | | 5,260 | | | | | | | | | | | |

Case 9:18-cv-80994-DLB   Document 155-1   Entered on FLSD Docket 12/05/2019   Page 80 of 80

**EXHIBIT 5**
**SUMMARY OF NEW CUSTOMERS**
**NTIV FEDERAL SERVICES, LLC & NTIV, LLC**

| Customer [1] | Company | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Customer #2681 | NTIV | - | - | - | 1 | - | - | - | - | - | - | - | - | - |
| Customer #2682 | Fed Serv | - | - | - | - | - | 1 | - | - | - | - | - | - | - |
| Customer #2683 | NTIV | - | - | 1 | - | - | - | - | - | - | - | - | - | - |
| Customer #2684 | NTIV | - | 1 | - | - | - | - | - | - | - | - | - | - | - |
| Customer #2685 | Fed Serv | - | - | - | - | - | 1 | - | - | - | - | - | - | - |
| Customer #2686 | NTIV | 1 | - | - | - | - | - | - | - | - | - | - | - | - |
| Customer #2687 | Fed Serv | - | - | - | - | - | 1 | - | - | - | - | - | - | - |
| Customer #2688 | Fed Serv | - | - | - | - | - | - | - | - | 1 | - | - | - | - |
| Customer #2689 | NTIV | - | 1 | - | - | - | - | - | - | - | - | - | - | - |
| Customer #2690 | NTIV | 1 | - | - | - | - | - | - | - | - | - | - | - | - |
| Customer #2691 | Fed Serv | - | - | - | - | 1 | - | - | - | - | - | - | - | - |
| Customer #2692 | Fed Serv | - | - | - | - | - | - | - | - | - | - | - | - | 1 |
| Customer #2693 | NTIV | 1 | - | - | - | - | - | - | - | - | - | - | - | - |
| Customer #2694 | NTIV | - | 1 | - | - | - | - | - | - | - | - | - | - | - |
| Customer #2695 | Fed Serv | - | - | - | - | - | 1 | - | - | - | - | - | - | - |
| Customer #2696 | NTIV | - | 1 | - | - | - | - | - | - | - | - | - | - | - |
| Customer #2697 | Fed Serv | - | - | - | - | - | - | 1 | - | - | - | - | - | - |
| Customer #2698 | NTIV | 1 | - | - | - | - | - | - | - | - | - | - | - | - |
| Customer #2699 | Fed Serv | - | - | - | - | - | - | - | 1 | - | - | - | - | - |
| Customer #2700 | NTIV | - | - | 1 | - | - | - | - | - | - | - | - | - | - |
| Customer #2701 | Fed Serv | - | - | - | - | - | 1 | - | - | - | - | - | - | - |
| Customer #2702 | NTIV | 1 | - | - | - | - | - | - | - | - | - | - | - | - |
| Customer #2703 | NTIV | 1 | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total New Customers** | | 393 | 439 | 228 | 135 | 346 | 377 | 261 | 130 | 99 | 87 | 83 | 67 | 54 |
| *Growth in New Customers* | | | 11.7% | -48.1% | -40.8% | 156.3% | 9.0% | -30.8% | -50.2% | -23.8% | -12.1% | -4.6% | -19.3% | -19.4% |

Source: QuickBooks Sales by Customer Summary.

Home   About ∨   Products ∨   Training ∨   Real Cases Solved   Resources ∨   Science ∨   AIS Course ∨   Blog   Contact Us   Visit Us

Register for Training   Español   العربية

## Number of Agencies per State

| State | Agencies | State | Agencies | State | Agencies | State | Agencies |
|---|---|---|---|---|---|---|---|
| Alaska | 10 | Illinois | 41 | Mississippi | 24 | South Dakota | 2 |
| Alabama | 33 | Indiana | 120 | Montana | 4 | Tennessee | 50 |
| Arkansas | 41 | Iowa | 6 | Nebraska | 1 | Texas | 1 |
| Arizona | 28 | Kansas | 23 | New Jersey | 50 | Utah | 36 |
| California | 196 | Kentucky | 8 | New Mexico | 9 | Virginia | 6 |
| Colorado | 51 | Louisiana | 49 | Nevada | 33 | Washington DC | 3 |
| Connecticut | 4 | Maine | 1 | New York | 80 | Washington | 19 |
| Delaware | 7 | Massachusetts | 7 | North Carolina | 79 | West Virginia | 18 |
| Florida | 175 | Maryland | 37 | Ohio | 207 | Wisconsin | 65 |
| Georgia | 99 | Michigan | 3 | Oregon | 9 | Wyoming | 4 |
| Hawaii | 3 | Minnesota | 22 | Pennsylvania | 63 | | |
| Idaho | 10 | Missouri | 177 | Rhode Island | 10 | | |

"The court also stated that "violations of the permanent injunction will be treated very seriously."  The following is the Conclusion of the permanent injunction"


UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA


Case No. 18-80994-Civ-Brannon


NITV FEDERAL SERVICES, LLC,


Plaintiff,


vs.


DEKTOR CORPORATION, and


ARTHUR HERRING III,


Defendants.


_____/


ORDER OF FINAL DEFAULT JUDGMENT


AND PERMANENT INJUNCTION AGAINST BOTH DEFENDANTS

CONCLUSION

Permanent Injunction

Plaintiff's Motion for Entry of Permanent Injunction Against Defendants [de 134] is GRANTED. Defendants, their shareholders, directors, officers, agents, servants, employees, successors, assigns, affiliates, joint venturers, and any and all other persons in active concert, in privity with them are PERMANENTLY ENJOINED from:

(a) Sending or transmitting any e-mails, text messages, letters, or other written correspondence to any entity (including any law enforcement agency or government agency) or person which contains any false or disparaging remarks or statements about Plaintiff, its CVSA product, or Plaintiff's founder/President, Charles Humble. To avoid any doubt, this restriction specifically includes, but is not limited to:

(1) any statement concerning the purported accuracy/reliability of CVSA;

(2) any statement suggesting that Plaintiff and/or its products are a scam or ineffective;

(3) any statement concerning the PSE's supposed proven superiority over the CVSA;

(4) any statement comparing or equating Plaintiff, its product, or its employees to the German Nazi party or Joseph Goebbels specifically;

(5) any statement that Plaintiff's products (including the CVSA) are no more accurate than a coin toss;

(6) any statement misrepresenting the pricing of Plaintiff's products;

(7) any statement that Mr. Humble received an unearned, fake, or 'store bought' diploma;

(8) any statement suggesting that the CVSA is just an expensive prop;

(9) any statement that law enforcement agencies continue to use Plaintiff's products in some conspiratorial effort to avoid overturned verdicts or lawsuits from defendants falsely convicted;

(10) any statement that any law enforcement officer has been wrongly fired because he flunked/failed a CVSA test yet was being truthful;

(11) any statement that the processes/procedures used by Plaintiff (such as numeric scoring, DSR [Delayed Stress Response], cold calling, kinesics, F.A.C.T. and DBR [Defense Barrier Removal] have no real substance or credibility;

(12) any statement that any of the enjoined parties has "heard from" current or former CVSA examiners that there are serious flaws with the CVSA;

(13) any statement that some purported 2007 study found serious design flaws with the CVSA that will produce flawed patterns/incorrect results;

(14) any statement suggesting that CVSA tests were affected/ruined by persons holding the microphone during the test;

(15) any statement that Plaintiff's recertification courses are 'bullshit' type classes and the same information taught in Plaintiff's original training courses;

(16) any statement suggesting that Plaintiff 'stole' or misappropriated Dektor's technology; and/or

(17) any suggestion that Plaintiff was somehow banned from advertising in insurance magazines or stopped advertising as a result of a drop in sales to law enforcement.

(b) Making any oral statement (whether in-person, telephonically, or otherwise) to any entity (including any law enforcement agency or government agency) or person which contains any false or disparaging remarks or statements

about Plaintiff, its CVSA product, or Plaintiff's founder/President, Charles Humble – including, but not limited to, the examples provided in subparagraph (a) above.

(c) Publishing or posting any website, blog, or other writing accessible via the internet which contains any false or disparaging remarks or statements about Plaintiff, its CVSA product, or Plaintiff's founder/President, Charles Humble – including, but not limited to, the examples provided in subparagraph (a) above. For the avoidance of doubt, this includes all information published on the www.NITVCVSAexposed.com website, all information published on the http://www.dektorpse.com/information/cvsa/ sub-page, and all mentions of Plaintiff/CVSA/Humble on http://www.dektorpse.com/information/imitations/. The enjoined parties shall immediately remove the aforementioned information from the subject websites (to the extent still there) and shall immediately remove from public view/unpublish the www.NITVCVSAexposed.com website in its entirety (to the extent still published). To be clear, the above-referenced content is not to be published or re-published on any website, blog, or other writing accessible via the internet and Defendants shall not do so or cooperate or assist any person with doing so.

(d) Representing or suggesting, explicitly or implicitly, that Dektor and Dektor Counterintelligence and Security, Inc. have any relationship or affiliation, that Dektor has been in business since 1969, that Dektor and Dektor Counterintelligence and Security, Inc. have cooperated in any way, or that Dektor's PSE product is in any way related to the PSE product sold by Dektor Counterintelligence and Security, Inc.

(e) The Court cautions that well-proven intentional violations of the permanent injunction will be treated very seriously.

- The NITV CVSA Scam
- Fake NITV CVSA Study Exposed
- NITV's Fake CVSA Study Revealed
- NEW: Dirk Bells Lies About Dektor For NITV
- NEW: "Insane" Dirk Bells Lies & Threatens Dektor For Humble
- NEW: NITV Owner Kane Promises CVSA Accuracy 98%
- NEW: NITV Humble Bought Fake Doctor Title From Fake University
- NEW: NITV Disgraces Great Seal of U.S. & Lies To Customers for Monetary Profit
- NEW: How Could NITV Staff Past and Present of Former High Level Law Enforcement Sell and Train Cvsa With No Study Proving CVSA Accuracy?
- NEW: Library of Congress Says Journal of Chapman Study Does NOT Exist
- NEW: NITV Threatens Dektor With Lawsuit 15 Years Ago
- NEW: Major Article Reveals Many Lies About NITV & CVSA
- NEW: "Crazy" Dirk Bell Sends Letter to Humble in 2004 About Herring
- NEW: Dektor's Lawyer Orders Dirk Bell to Stop Harassment, But Bell Ignores
- NEW: Fake Humble "Doctor" Title by Fake University
- NEW: NITV's Humble Owed Huge Debt to Collection Business For 4 Years
- NEW: NITV Posts Groveport Police Lies About Dealing With Dektor
- NEW: When CVSA Buyers Purchase CVSA, NITV Does NOT Let Them Own It
- NEW: Humble Claims CVSA 98% Accurate Despite NO Studies Proving It
- NEW: Humble Convicted in 1988 of Copyright Fraud
- NEW: NITV Says in Court CVSA Not a Lie Detector, but NITV Website Says It Is
- NEW: Disgusting Lies About Dektor & Owner Sent Twice by NITV to Law Enforcement
- NITV Hires Disgraced Ex-cop
- NITV Promotes Incompetent Disgraced Ex-cop as Director
- NITV Uses Fake DoD "Survey" to Sell CVSA
- NITV Lies About DoD CVSA Study
- Humble Lied! NO DoD Funded Study Ever Validated CVSA
- NITV CEO Charles Humble Dedicates a Website to Himself
- Humble Pretends National Company Wanted Him to Invent Their New Voice Lie Detector
- ABC News Video Exposes NITV/CVSA Scam
- Primetime Investigation Prove NITV/CVSA Lies
- Groveport Police Lied about Dektor
- Groveport Mayor & City Council Ignore Police Fake Lie Detector
- NITV Owner Lied About Inventing New Lie Detector
- Major Law Enforcement Association Protects NITV Scam
- Politicians & Law Enforcement Refuse to Stop NITV Scam
- Did NITV Bribe SOCOM?
- NITV LIES! CVSA Was Not PSE in Vietnam War
- NITV Found Guilty by U.S. Government

---

- <u>Did NITV Bribe SOCOM?</u>
- <u>NITV LIES! CVSA Was Not PSE in Vietnam War</u>
- <u>NITV Found Guilty by U.S. Government</u>
- <u>SCAM! Computer Voice Stress Analyzer (CVSA) Sold for 8 Years NEVER Had a Computer!</u>
- <u>NITV Admits Never Inventing New Lie Detector</u>
- <u>Charles Humble Demands Promise Not To Sue Him</u>
- <u>Charles Humble Admits NO Study Proves CVSA Accuracy</u>
- <u>NITV Owes Massive Judgement</u>
- <u>Dirk Bell Lies About Dektor</u>
- <u>NITV Lets Dirk Bell Lie About Dektor & It's Owner</u>
- <u>Newsmedia Quotes About NITV, CVSA & Humble</u>
- <u>Humble Sanctioned by US Commerce Department for Export Violations</u>
- <u>Ex CVSA Users Condemn CVSA & Training</u>

...OBER 31 NOVEMBER 6, 1988 • INDIANAPOLIS BUSINESS JOURNAL: 3?

# Rock Island, others slapped with judgment in lie-detector case

## United Oil...conducted voice-stress exams on prospective employees.

BY JOHN KETZENBERGER

Two subsidiaries of Rock Island Refining Corp. and several individuals were found guilty of copyright infringement in a case that stems from administering written examinations to prospective service-station employees.

U.S. District Court Judge William E. Steckler fined United Oil Service Inc.; R.I. Marketing Inc.; Richard Jones, United's vice president; and Charles W. Humble and Gary L. Nelson, both independent psychological-stress examiners, nearly $61,800 for copying a written examination developed and copyrighted by Reaume & Associates Inc.

A motion by the defendants to reconsider the decision was rejected by Steckler, and Christopher Braun, an attorney for United Oil, said the company is considering an appeal. The defendants have until Nov. 18 to decide whether to make an appeal.

The judge ruled that the defendants should pay $30,000 in statutory damages to Reaume for copying and using the written test without permission from the authors, Henry J. and Ann Reaume. The remainder of the judgment covers costs and attorney's fees.

The Reaumes were hired in July 1979 by United Oil to conduct voice-stress evaluations on prospective service-station em-

ployees. United Oil subsequently purchased several hundred copies of a written test developed by the Reaumes called ASSIST, which received copyright and trademark protection in 1979.

In June 1980, United Oil hired Charles Humble to replace the Reaumes and conduct voice-stress exams on prospective employees, those seeking promotions and those suspected of specific acts. According to court documents, at some point between 1980 and 1983, United VP Jones gave

Humble several copies of the ASSIST test, customized to United's specifications, for use in conjunction with the voice tests.

Humble used the ASSIST test until September 1985, when he concluded that the test had "limited value" in screening applicants based on theft, drug use and honesty criteria. It is unclear, however, how many times Humble used the test, because United Oil destroyed all of its business records for 1982 and 1983. At the same time, Humble destroyed all of his copies of invoices to United for the same two years, according to the court's findings.

Widespread copying of the test occurred beginning in 1983, when United and R.I. Marketing merged. The resulting addition of numerous service stations meant testing outside Humble's office, where it had previously occurred, and further copying and use.

The copying was discovered both by Reaumes in 1985, when Nelson, a former student of Humble's, offered to sell the ASSIST test to two other oil companies including another that was a client of the couple.

An out-of-court settlement of $2,700 plus costs was rejected by the Reaumes shortly after they filed suit in October 1985. Additional claims of unlawful trade practices, unfair competition and trademark infringement brought by the Reaumes against United Oil, R.I. Marketing and Jones were dismissed last August.

Radnor Corporation wishes to thank
William Ehret of F.C. Tucker Company,
as it welcomes Summit Bank
as a new tenant to 101 West Ohio.

INSIDE



Exhibit 13





 **NEWS**

# 'Innocent Until Proved Guilty?'

### Questions Are Being Raised About a Voice Lie Detector Used by 1,500 U.S. Police Departments and the U.S. Military

**March 30, 2006** —- - A Pentagon study obtained by ABC News finds that a new kind of voice lie detector used by the U.S. military and American police departments is no better than "flipping a coin" in detecting lies. Until the Pentagon ordered a halt to its use, the Voice Stress Analyzer was being used by military intelligence interrogators at Guantanamo Bay and in Iraq. Several suspected terrorists were released from custody based on the machine's results and former Iraqi deputy prime minister Tariz Aziz was one of the many "high value targets" who were hooked up to the now discredited machine.

A laptop, microphone and software program make up what is called the computer-voice stress analyzer, or CVSA. Used by police departments across the country, this lie detector is a foolproof system to help catch criminals and liars, according to the man behind it.

"Police departments have paid $10,000 per system over the last 18 years and rely on it exclusively for truth verification," said Charles Humble, chairman and CEO of the National Institute for Truth Verification, which sells the CVSA. "We have a remarkable record of success."

But as questions surrounding the scientific validity of the machine and Humble's credentials grow, not everyone agrees that that should be the case .

### Confesses to Murder Based on Machine

After Michael Crowe's 12-year-old sister, Stephanie, was found stabbed to death in her bedroom, the Escondido, Calif., police department brought him into the station for questioning and hooked him up to the CVSA in the middle of the night.

From tapes recorded during his questioning, Crowe answered "Yes" when the detective asked, "Is today Thursday?" But when Crowe replied "No" when asked whether he took Stephanie's life, the detective told him that he had failed the test.

"I started to think that, you know, maybe the machine's right, especially when they added on top of it that the machine was getting my subconscious feelings on it, that I could be lying and not even know it," Crowe, now 21, told "Primetime." "They said the machine is more accurate than the polygraph and is the best device for telling the truth, for finding the truth."

Once the detective told him that he had failed the test, Crowe said he began to doubt his own memory and wonder whether he might have killed his sister.

"I didn't want to go to prison, and I just wanted to be out of that room," Crowe recalled. "So my only option was to say, 'Yeah, I guess I did it,' and then hope for the best."

Crowe said the police used the machine to persuade him to confess and then to implicate two of his

classmates.

"So I got a knife, and I went into her room, and I stabbed her," Crowe can be heard saying on tapes from his questioning.

But one week before the start of his trial, the police found DNA evidence that led to the real killer, a transient who is now in prison for killing Crowe's sister. The judge denounced both the false confession and Humble's machine.

"I don't believe the instrument was wrong. Now were the examiners wrong? I don't know," Humble replied when asked about the case. "I don't believe I owe Michael Crowe an apology."

**'Nothing More Than a Prop'**

But when the Crowe family sued Humble and his company, the National Institute for Truth Verification, the case was settled out of court. During a deposition, a top executive from Humble's company admitted under oath that the machine is not capable of detecting truth or lies.

"This device is nothing more than a prop," said John Palmatier, who earned a doctorate in psychology and who studied the machine for the Michigan State Police Department, where he worked. He said his study along with others found no scientific basis for Humble's claims.

"You could not accurately discriminate between truthful and deceptive subjects using that device," said Palmatier. As to whether the device could be used as a scare tactic, Palmatier answered, "Oh, exactly. Police officers have for years."

In his view, Palmatier said that explains the police endorsements that Humble puts in his promotional materials, citing one case after another solved with the stress-analyzer machine.

Humble said the machine can only really be tested in the field, where he said it has a 98 percent accuracy rate.

"We teach that it's an investigative tool. It's not meant for a detective to go out and get a search warrant or to get an arrest warrant," Humble said.

But that is not exactly what happened in Las Vegas in the case of Vincent Sedgwick, married with a young daughter. He was wrongly charged with rape, which carried a possible life sentence. His arrest warrant was based largely on his supposed failure on a CVSA test.

"I went from shock to anger and a lot of resentment, very bitter toward them for doing that," recounted Sedgwick.

Equally outraged, Lee Gates, the judge in the case, threw out the charges against Sedgwick and harshly criticized the police for relying on a machine that he called scientifically unreliable.

"Not only did they use it for investigative purposes, but they used it as a predicate to get him arrested and to have him charged and brought into the criminal justice system, which I think was the biggest miscarriage of justice," said Gates.

In the promotional videos that Humble uses to sell his machines to American law enforcement, there is

ABC News: 'Innocent Until Proved Guilty?'                                                    Page 3 of 3

no mention of Sedgwick's and Crowe's cases.

"Before you go and ruin a man's life, it's important to verify the allegations of child molest, rape, that sort of thing," Humble said in the video.

Although throughout the video Humble is referred to as Dr. Humble, "Primetime" discovered that he is neither a medical doctor nor has he earned a doctorate from an accredited university.

Instead, the diploma on his office wall, which reads "Doctor of Psychology," is an honorary degree, awarded by a Bible college in Indiana that used to have an office in the strip mall where Humble's first office was located.

Pressed as to whether giving himself the "doctor" title is honest, Humble replied, "I think it is."

Finally, Humble claims his firm sold more than a million dollars worth of his machines to the U.S. military.

Military officials confirmed to "Primetime" that the machines were in use in prisons in Guantanamo Bay in Cuba and Iraq until the Pentagon finally banned them.

Robert Rogalski, deputy undersecretary of defense for counterntelligence, said that an exhaustive Pentagon-ordered study of the stress analyzer, whose results are now being made public, found little or no relationship between the machine's reading and the actual presence or absence of deception and stress.

"We feel we need a greater reliability, just as the report indicated, chance, in other words, flipping a coin," said Rogalski.

He was alarmed to hear about a document from Humble's company that bragged that one of its employees had used the machine in Baghdad to free a number of suspected terrorists.

"It's very troubling," Rogalski said of the document. "How truthful was that result, and if there's a question, then I'm concerned about that." He admitted he is especially concerned about the prospect that some of those suspected terrorists were actual terrorists.

As for Crowe, he said he is still trying to get past the experience of being accused of his sister's murder and being locked up for nine months, in large part because of Humble's machine.

"It's a scare tactic, but it's an expensive one, and it's unfortunate that you have police officers who believe in it," said Crowe of his experience. "Who knows how many mistakes they've made by taking this for faith?"

*ABC News' Vic Walter, Joe Rhee and Avni Patel contributed to this report.*

Copyright © 2006 ABC News Internet Ventures

*Exhibit 16*

| Name | Date | Type | Size |
|---|---|---|---|
| ross 1 4 13 iacp ad refusing | 1 4 2013 9:55 AM | Outlook Item | 67 KB |
| ross 4 9 12 cvsa | 4 9 2013 9:45 AM | Outlook Item | 26 KB |
| ross 9 7 12 reply | 9 7 2013 9:46 AM | Outlook Item | 31 KB |
| ross 12 18 12 no response cvsa | 12 18 2013 10:14... | Outlook Item | 32 KB |
| ross baines vancouver sun | 4 9 2013 9:45 AM | Outlook Item | 53 KB |
| ross cvsa 4 9 12 zimmerman | 4 9 2013 10:18... | Outlook Item | 36 KB |
| ross cvsa 12 18 12 | 12 18 2013 9:55 AM | Outlook Item | 31 KB |
| ross johnson iacp cvsa | 9 10 2013 10:11... | Outlook Item | 68 KB |
| ross lied about trump | 7 12 2017 9:59 AM | Outlook Item | 125 KB |
| ross schwartz 7 2 14 no reply iacp | 7 2 2017 10:01... | Outlook Item | 46 KB |
| ross schwartz 7 6 14 no reply | 12 12 2017 10:03... | Outlook Item | 43 KB |
| ross schwartz 7 10 14 iacp update | 9 3 2014 9:25 AM | Outlook Item | 61 KB |
| ross schwartz 8 3 14 iacp | 12 12 2017 10:00... | Outlook Item | 42 KB |
| ross schwartz 8 3 14 no response | 12 12 2017 10:03... | Outlook Item | 49 KB |
| ross schwartz cvsa in canada | 12 12 2017 10:02... | Outlook Item | 34 KB |
| ross schwartz iacp involvement | 12 12 2017 10:02... | Outlook Item | 42 KB |
| ross schwartz iacp no reply | 12 12 2017 10:00... | Outlook Item | 42 KB |
| ross socomm lva | 9 12 2008 5:27 PM | E-mail Message | 6 KB |

## Controversial device popular with public, private employers

While the tests are becoming increasingly popular, accuracy is questioned

BY DAVID BAINES, VANCOUVER SUN · MARCH 14, 2011



Bob Wall (far right) and Don Wiebe test a subject using a device called a computer voice stress analyzer. While Wall and Wiebe claim an accuracy rate of 98 per cent or better, other at
Photograph by: Darren Stone, Postmedia News Files, Vancouver Sun

*First in a series*

Public and private agencies are using a "truth verification" device that has been discredited by numerous authorities as a tool to screen hundreds of job applicants in B.C.

The tests are being administered by ITV Consulting Inc., a Victoria firm that licenses the Canadian rights to the Computerized Voice Stress Analyzer (CVSA) from a U.S. company.

As stated on ITV's website, the device "measures small frequency modulations in the voice. These inaudible variations, when detected, measured and displayed, accurately determine the truthfulness of each statement elicited from a test subject."

ITV is owned and operated by two retired Saanich police detectives, Don Wiebe and Bob Wall. An active Saanich member, Det. Sgt. Craig Sampson, is also listed as a staff member.

ITV's clients include:

- B.C. Corrections branch, which administers the province's correctional facilities and programs. The branch says ITV has conducted 645 CVSA tests to pre-screen job applicants during the past three years.

- University of Victoria campus security department, which says ITV has conducted about 50 similar tests on prospective employees during the past five years.

Controversial device popular with public, private employers

- Sundry financial institutions, which hire ITV to conduct tests on employees who are suspected of internal malfeasance. ITV says it has conducted 15 to 20 such tests.

ITV claims the device can definitively tell whether a person is lying: "The finished session is evaluated by the computer, rendering its findings of 'deception' or 'no deception,' removing any possibility of examiner error, as well as providing a completely objective examination," it states on its website.

The firm recommends the device be used in conjunction with "the expert interrogation techniques used and taught by ITV."

"Used in this manner, clinical studies show the accuracy score of our product to be 98 per cent with no inconclusives," it states.

This is an impressive statement. If true, the CVSA is the holy grail of lie detectors. However, there is little scientific evidence to support this claim, and much to repudiate it.

In a 2007 study funded by the U.S. Department of Justice, researchers used two voice stress analyzers systems - including the CVSA device used by ITV consulting - to quiz people who had just been arrested about their recent drug use, then compared their answers with the results of urine tests.

"Both VSA programs show poor validity -neither program efficiently determined who was being deceptive about recent drug use. The programs were not able to detect deception at a rate any better than chance," the study concluded.

It added: "The data also suggest poor reliability for both VSA products when we compared expert and novice interpretations of the output."

In other words, the expertise of the examiner didn't matter.

More generally, the researchers noted that "no published research studies have demonstrated that VSA programs can distinguish between 'general' stress and the stress related to being deceptive "

Despite numerous studies that make similar conclusions, voice stress analyzers have become very popular, particularly in the United States since the September 2001 terrorist attack on New York City.

The firm that licenses the device to ITV, the National Institute of Truth Verification (NITV), located in West Palm Beach, Fla., claims it is "used by 1,800 local, state and federal agencies, as well as by U.S. Military Special Operations and Intelligence units."

The popularity of the device, combined with its questionable accuracy, raises the question: How many false readings does it generate and, as a result, how much harm does it do?

"The people we have done it for are very pleased with it. We have had no issues in all the years I have done it," Wiebe said in an interview. "I believe in its ability to detect deception ... If I didn't have 100-percent confidence in the CVSA, I wouldn't be using it."

In any event, he said, the tests are voluntary, and job applicants are never disqualified on the basis of a CVSA "without something to back it up."

The tests are, strictly speaking, voluntary. But if you want to apply to the Saanich police force or the B.C. Corrections branch, they are mandatory. They are not mandatory at UVic, but refusal is a factor that is "weighted" against the applicant, says campus security director Peter Zacour.

Wiebe was introduced to the CVSA device in 2002, while he was still working as a Saanich police detective. He conducted a six-month study, using it for both criminal investigations and pre-employment screening, and came up with some stunning results:

"The CVSA has been used 35 times and it has shown a 100-per-cent accuracy rate. All the tests conducted have either had the results confirmed by investigation or confession," he stated in his report.

Controversial device popular with public, private employers

"In 21 CVSA examination that resulted in deceptive results, 17 of the subjects have admitted to the allegations. This would be an 86-per-cent confession rate, which is extraordinarily high. The other four deceptive results were confirmed by investigation."

Wiebe said the device was also used to screen prospective police members: "This has resulted in three quality candidate being hired and one possible candidate being denied due to pre-and post-test admissions during the examination. I believe that as a result we are getting a higher calibre of recruits ..."

The report included summaries of each case. Many are not as conclusive as Wiebe's report suggests. For example, he describes how tests were conducted on two people who had access to stolen drugs at a handicapped facility.

"The male was tested and showed that he was telling the truth and he was not involved in the theft of the narcotics.

"The female who was initially cooperative refused to take a test when offered the chance.

"Further information provided by the same male and other staff members showed that the female had a drug addiction problem and was suspected of stealing other items

"The female no longer works for the facility."

As described, there is nothing remotely scientific about this case study. It is strictly anecdotal. A firm conclusion (that the device worked) was made on the basis of circumstantial evidence (that other people said she did it).

Reputable agencies in the United States, meanwhile, were conducting their own studies, and coming to quite opposite conclusions.

In November 2003, the Virginia Department of Professional and Occupational Regulation published a report entitled Study of the Utility and Validity of Voice Stress Analyzers

The report noted there had been "no scientific studies conducted, to date, to measure the validity of the computer stress analyzer to detect deception."

"Manufacturers contest that their computer stress analyzers are 100 per cent accurate and effective by producing testimonials as a foundation to their claims, but this is not widely accepted as scientific validity."

The report said the U.S. Department of Defence Polygraph Institute -which is mandated by the U.S. Congress to study new lie detection technologies -had conducted a series of studies that "produced no evidence that the use of the CVSA provides accuracy rates better than chance."

The defence department also noted that a study conducted by the U.S. National Research Council "indicated accuracy rates at or below chance levels, and low levels of reliability, both being necessary cornerstones for a successful diagnostic tool "

Notwithstanding the dearth of scientific support for the device, Saanich police -based on Wiebe's report -decided to adopt it for both criminal investigations and screening new police recruits.

Wiebe soon realized he could not only use the device for police investigation purposes, but also for private commercial purposes.

In 2004, while still working for the Saanich police force, he began marketing CVSA testing services and interrogation techniques to other police forces, government agencies and financial institutions.

The following year, he incorporated ITV Consulting, through which he now markets these services. He was later joined by Wall, who became a business partner and co-director of ITV. In February 2008, they both retired from the police force and began working full time for the firm. At some point, Sampson, who is head of Saanich's major crimes section, became associated with the firm.

As a Saanich police officer and certified CVSA examiner, Sampson conducts pre-employment screening tests for the force.

Controversial device popular with public, private employers                    Page 4 of 4

When he is not available, the force hires ITV to screen prospective applicants. To date, ITV has conducted seven such tests, all in 2009.

Sampson also contracts his services to ITV on an as-needed basis. (He has written permission from the Saanich Police Board to perform this outside work and, in any event, he does not do any work for ITV that involves Saanich police.)

Insp. Rob McColl, who is head of Saanich's detective division (and Sampson's boss) said the force stopped using the CVSA device for criminal investigations in 2007, not because they lost faith in its ability to detect lies, but because the RCMP installed a polygraph operator in Victoria, which made it more economical to use that device.

He said Saanich police still use the CVSA device to screen prospective recruits.

I asked McColl whether he has seen any scientific study to support ITV's claim that the device is 98-per-cent accurate.

"Personally, no," he replied. "I have no technical data to back it up or take issue with it. My view of these instruments (polygraphs and CVSA devices) is that any of them are only as good as the operators. It's a tool we use, and in my view, it's an effective tool."

I asked Wiebe to show me the "clinical studies" that show the device is 98-per-cent accurate, as he advertises on his website.

To my surprise, he said he had never seen any of them. He said he simply took the claim at face value from the National Institute of Truth Verification, the Florida company that manufactures the device and sold ITV the licensing rights in Canada.

NEXT: We learn that the founder of the National Institute of Truth Verification, Dr. Charles Humble, earned his PhD in a strip mall in Indiana after six hours of bible study.

dbaines@vancouversun.com Read David Baines' blog at www.vancouversun.com/baines

© Copyright (c) The Vancouver Sun

# 'Father' of voice stress analysis got PhD after six hours of bible study at strip mall

**BY DAVID BAINES, VANCOUVER SUN COLUMNIST**   MARCH 15 2011



'Dr.' Charles Humble, founder of the National Institute of Truth Verification, was the subject of an ABC Primetime News expose.
**Photograph by:** PNG files, .

### Second in a series

The National Institute of Truth Verification, a private company based in West Palm Beach, Fla., claims that its Computerized Voice Stress Analyzer is 98-per-cent effective in detecting whether somebody is telling the truth.

The tests — which purport to measure voice stress and, therefore, deception — are offered in Canada by ITV Consulting Inc., a Victoria company run by two former Saanich police detectives, Don Wiebe and Bob Wall.

Since the company was founded in 2005, ITV has administered hundreds of test for public and private employers in B.C.

The B.C. Corrections branch, which administers the province's correctional facilities and programs, says ITV has conducted 645 CVSA tests to screen job applicants during the past three years.

The University of Victoria campus security department says ITV has conducted about 50 similar tests on prospective security personnel during the past five years.

Sundry financial institutions have also used ITV to test employees who are suspected of internal malfeasance. ITV says it has conducted 15 to 20 such tests.

Saanich police also use the device to screen prospective recruits.

On its website, ITV states that clinical studies show the device, used in conjunction with the "expert interrogation techniques used and taught by ITV," is 98-per-cent accurate "with no inconclusives."

However, when I asked Wiebe for scientific proof, he was unable to provide any. He said he was simply relying on NITV, from which it licenses the rights to sell the device and administer the tests in Canada.

NITV lists as its founder Charles Humble, "widely considered the 'father' of modern day voice stress analysis."

Humble is a former U.S. army officer and Indianapolis police officer. In March 2006, he was the subject of an ABC Primetime News expose.

Pressed by ABC reporter Brian Ross, Humble admitted he got his "doctorate" in psychology from an unaccredited university, Indiana Christian University — which at the time was located in the same strip mall that NITV had its office — after just six hours of bible study.

"And you call yourself 'Dr.' Humble based on that?" Ross asked.

"Yes," Humble replied.

"Is that honest, do you think?"

"I think it is."

NITV must also think it's honest, because it continues to refer to him as "Dr." Humble, and he is still listed as an NITV director.

I asked Wiebe what he thought when Humble provided details of his doctorate:

"I thought it was a personal thing on him. I didn't think it had anything to do with the CVSA itself," he said.

During the ABC interview, Humble repeated the 98-per-cent accuracy claim.

Ross asked whether there had been an independent study to corroborate that.

"I don't believe that there has been an independent scientific study that shows this actually works," Humble admitted.

It does not appear that any corroborating studies have been done since the ABC interview. NITV lists 15 "studies validating voice stress analysis," but they all predate the interview. Wondering whether any studies had been done since the interview, I called NITV's office in West Palm Beach. A short while later, I received a call from somebody who introduced himself as "professor emeritus" Jim Chapman.

Chapman said he has "no real connection" to NITV. However, he is a director — along with Wiebe and several other certified CVSA examiners — of the National Association of Computerized Voice Stress Analysts.

The association is dedicated to promoting the CVSA device. Given that NITV is the "manufacturer and sole source" for the device, the association essentially acts as NITV's promotional arm.

Chapman told me he has just completed a 19-year study confirming that the CVSA device is 96.4-per-cent accurate. He also said the study has been peer reviewed, but when I asked for a copy, he said it has not yet been published, and until it is, he could not provide one.

When I asked whether he could refer me to any other study confirming a 98-per-cent accuracy rate, as advertised by NITV, he suddenly became quite angry:

"You are a dangerous man," he said. "What you are doing is putting people's lives in jeopardy. I resent that you are trying to put U.S. troops and people in [criminal enforcement] in jeopardy by casting aspersions [on the CVSA device.]"

One of the studies referenced on both NITV's and ITV's websites was conducted in 2005 by the U.S. air force Research Laboratory on behalf of the U.S National Institute of Justice.

That study — which analyzed recorded interviews and was not peer reviewed — found that voice stress analyzers are capable of detecting truth or deception at a rate "better than chance."

However, the researchers dismissed the notion that these devices, by themselves, are lie detectors. The accuracy rate, they found, was also a function of the examiner's experience.

"VSA systems are capable of providing an examiner with a waveform or other response that may be a reasonable reflection of the stress level being experienced by the subject, in a majority of the cases," they stated.

But they said the critical leap — equating that stress to deception — is something the examiners should decide, not only with reference to the stress reading, but also the subject's demeanour "and other evidence from the case."

The researchers' heavy emphasis on subjective elements is at odds with ITV's claim that the CVSA examination is completely objective.

On its website, the company claims CVSA readings are evaluated by computer "removing any possibility of examiner error, as well as providing a completely objective examination."

The researchers concluded: "The goal in using a VSA system or polygraph should be to convince the subject that they cannot deceive the operator, and that the instrument will detect their deception and their best avenue is to confess to the crime."

In other words, the instrument should be used to intimidate subjects and, given the high number of false readings, fool them into telling the truth.

Clearly, any black box could do that.

dbaines@vancouversun.com

***Read David Baines' blog at*** vancouversun.com/baines

© Copyright (c) The Vancouver Sun

# B.C. Corrections using 'truth verification' device to screen job applicants

**BY DAVID BAINES, VANCOUVER SUN**   MARCH 16, 2011

The B.C. Corrections branch is a big believer in the Computerized Voice Stress Analyzer, a device that purports to be able to detect deception by measuring modulations in the subject's voice.

CVSA tests are mandatory for anybody applying for a correctional officer job at a provincial custody centre.

The tests are conducted by ITV Consulting Inc., a Victoria company run by former Saanich police detectives Don Wiebe and Bob Wall.

During the last three years, ITV has conducted 645 tests for the branch. The firm charges $250 to $300 per test.

The corrections branch says it uses the CVSA device as part of its screening process: "There are multiple steps in B.C. Corrections' screening process for new employees and the CVSA interview is intended to complement those other steps," it stated in an email.

But a letter of recommendation provided to ITV in May 2006 by Tedd Howard, then warden of the Prince George Regional Correction Centre, indicates that the device has been instrumental in deciding who is hired, and who is not.

During the previous year, he stated, ITV had tested 52 prospective employees: "Of the 52 applicants, 16 were screened out as unsuitable that would otherwise have been hired.

"The CVSA test results indicated deception and criminal activity omissions including such things as use of illegal substances, solicitation of prostitution, sex offences, acts of violence, as well as a myriad of theft, fraud and trafficking offences."

Problem is, equating voice stress with deception is a dicey theory. Most credible studies show voice stress analyzers are no more effective than flipping a coin.

A 2007 field study funded by the U.S. Department of Justice used two voice stress analyzers systems -including the one used by ITV consulting -to quiz people who had just been arrested about their recent drug use, then compared their answers with the results of urine tests.

"The programs were not able to detect deception at a rate any better than chance," the study concluded.

The study found, however, that subjects were less likely to lie about their drug use if they thought the device could actually detect lies. This is known as the "bogus pipeline effect," and may, in fact, be the device's only utility.

Offsetting this utility, however, is the prospect of incriminating -and disqualifying -an innocent applicant.

Several posters on Officer.com, an online discussion group for U.S. law enforcement officers, claim they were unfairly disqualified by CVSA tests.

"I failed a CVSA a few months back," one poster stated in February 2008. "I spiked on 'Have you ever used Cocaine?' Funny thing is, I have NEVER used any illegal narcotics. It DQ'd [disqualified] me."

Wiebe insists that no applicant is disqualified on the basis of a CVSA test unless there is corroborating evidence, but posters on Officer.com have heard this sort of assurance before:

"You cannot be DQ'd strictly for not passing a polygraph or CVSA," one poster advised. "They are strictly tools to be used to support what has already been found or point where to look. If they told you that you are DQ'd based on the test alone you may want to bring up the Federal Protection Act."

To which another poster replied: "The problem is they never do DQ you for the test alone, they always give you an answer like, 'Due to issues arising from your background investigation.'"

Lorna Fadden, a Vancouver expert in forensic linguistics, said she is "disturbed that provincial agencies would use this device."

Fadden completed her doctorate in forensic linguistics in 2008, and has taught at SFU and the B.C. Justice Institute. She also consults for law enforcement agencies and legal counsel on cases involving language evidence.

"There is no actual proven correlation between vocal stress and telling a truth or lie," she told me in an email this week.

"Even if there were, there are simply too many factors to foul up reliable results. What might be viewed as voice stress might actually be due to pathological speech, natural or medication-induced tremor, illicit narcotics and so on. For all we know, a mild case of hay fever could interfere with vocal stress."

She concluded: "No product, method or technique that has the potential to alter the course of someone's life should be on the market without rigorous testing." On its website, ITV claims that clinical studies show the device, used in conjunction with the "expert interrogation techniques used and taught by ITV," is 98-per-cent accurate "with no inconclusives."

But neither ITV, nor the National Institute of Truth Verification -the Florida company that licenses the technology to ITV and makes the same boast -can produce an independent study to back up this assertion.

Fadden dismisses their claim as "preposterous .. The polygraph is probably the best we have, but there is darn good reason it's not admissible in court, either."

Despite its dubious accuracy, the device has proved to be popular, particular after the 9/11 terrorist attacks.

NITV claims the CVSA device "is used by 1,800 local, state and federal agencies," but it doesn't name the agencies, which makes this figure impossible to confirm.

NITV also claims the device is used by "U.S. Military Special Operations and Intelligence units." However, the U.S. Department of Defense prohibited the use of voice stress analyzers in 2005.

"Merely getting people to talk is not sufficient," Robert Rogalski, Acting Deputy Under Secretary of Defense (Counterintelligence and Security), explained in a March 2006 letter to the American Spectator.

"That information must be assessed for accuracy and truthfulness. . Until scientific testing adequately proves the reliability and accuracy of CVSA, the Department of Defense would be irresponsible to condone the acquisition of such an instrument."

Rogalski noted that researchers at the University of Florida had just completed a study of voice stress analysis "and we await the opportunity to review that study."

Within days, that study was released. It concluded that "neither CVSA nor [a similar device] showed any sensitivity to the presence of deception or stress."

Despite all these concerns, CVSA tests are being routinely administered in B.C. In addition to the corrections branch, the University of Victoria uses the device to screen security personnel; the Saanich and Oak Bay police forces use it to screen prospective police recruits; and sundry financial institutions use it to ferret out malfeasance.

dbaines@vancouversun.com Read David Baines' blog at www.vancouversun.com/baines

March 12: Computerized Voice Stress Analyzers are increasingly popular, but their usefulness is being questioned.

March 15: We learn that NITV's founder, Dr. Charles Humble, obtained his 'doctorate' from a diploma mill in Indiana.

today: Are job applicants being unfairly disqualified?

© Copyright (c) The Vancouver Sun